UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:24-cv-00497

| | |
|---|---|
| **DIMITRE MITEV,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT and** |
| ) | **JURY TRIAL DEMAND** |
| **SALESFORCE, INC.,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, Dimitre Mitev ("Mitev" or "Plaintiff"), by and through counsel, brings this action for violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, against Salesforce, Inc. ("Defendant"). Plaintiff additionally brings claims under North Carolina common law for wrongful discharge in violation of public policy.

## NATURE OF PLAINTIFF'S CLAIMS

1. Defendant unlawfully discriminated against Plaintiff in violation of the ADA by failing to engage in the interactive process to find a reasonable accommodation that would allow Plaintiff to perform the essential functions of the job. Plaintiff complained to Defendant's Human Resources ("HR") department about his supervisor's discriminatory treatment and Plaintiff's supervisor responded by stating, "you should start looking for another job." Instead of terminating Plaintiff right away, Plaintiff's supervisor provided Plaintiff two options: (1) voluntarily resign or (2) accept a 30-day PIP. Plaintiff told his supervisor he was not quitting. Thirteen days later, Plaintiff applied for and was granted FMLA protected leave. The following day, Plaintiff's supervisor put him on a 30-day PIP, telling him "I saw you filed for FMLA leave last night."

Within a week of returning from FMLA leave, Plaintiff's supervisor reminded Plaintiff about the PIP, stating "this is not going anywhere." A few days later, Plaintiff filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC"). Within two weeks of filing the Charge of Discrimination, Defendant discriminated against Plaintiff by terminating his employment because of disability and using the discriminatory PIP to justify the termination.

## THE PARTIES

2. Plaintiff is an adult individual who is a resident of Waxhaw, North Carolina.

3. Defendant is a foreign limited liability company formed under the laws of Delaware and is registered and in good standing in the State of North Carolina with its principal office located at 415 Mission Street, 3rd Floor, San Francisco, California 94105.

4. At all times relevant to this lawsuit, Defendant employed Plaintiff at its facility located in Charlotte, North Carolina.

## JURISDICTION AND VENUE

5. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 to hear claims brought under federal law, including claims under the ADA, 42 U.S.C. § 12101 *et seq.*, and FMLA, 29 U.S.C. § 2601 *et seq*.

6. Plaintiff's wrongful discharge in violation of public policy claim is based on the law of the State of North Carolina. Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for the pendent state claims because they arise out of the same nucleus of facts giving rise to Plaintiff's ADA and FMLA claims.

7. This Court has personal jurisdiction because Defendant conducts substantial business in Mecklenburg County, North Carolina, which is located within this judicial district.

8. Venue is proper in this judicial district because Defendant has substantial business contacts in this district and because the unlawful acts alleged herein occurred in Mecklenburg County, North Carolina, which is located within this judicial district.

## COVERAGE ALLEGATIONS

9. At all times relevant to this action, Plaintiff was a "qualified individual" covered by the protections of ADA, as amended, within the meaning of 42 U.S.C. § 12111(8).

10. At all relevant times, Defendant was a "covered entity" engaged in an industry affecting commerce and had at least fifteen (15) or more employees each working day.

11. At all relevant times, Plaintiff was an "employee" within the meaning of 42 U.S.C. §12111(4).

12. Defendant was an "employer" within the meaning of 42 U.S.C. §12111(5).

13. Defendant employed at least fifteen (15) employees at all relevant times.

14. Plaintiff timely filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") (Charge No. 430-2023-01870) alleging discrimination based on disabilities and retaliation on or about March 16, 2023.

15. Following Plaintiff's termination on March 27, 2023, Plaintiff timely filed a Charge of Discrimination against Defendant with the EEOC (Charge No. 430-2023-03927) alleging retaliation on or about August 23, 2034.

16. The EEOC issued Notice of Suit Rights for Charge No. 430-2023-01870 on February 22, 2024, and Plaintiff timely brings this action within ninety (90) days of his receipt thereof. The EEOC issued a Notice of Suit Rights for Charge No. 430-2023-03927 on February 28, 2024.

## PLAINTIFF'S FACTUAL ALLEGATIONS

17. In or about 2016, Mitev was diagnosed with Ramsay Hunt Syndrome. Although Ramsay Hunt Syndrome is treatable, it is a permanent medical condition.

18. Ramsay Hunt Syndrome occurs when a shingles outbreak affects the facial nerve near a person's ear. Ramsay Hunt Syndrome can cause facial paralysis and hearing loss. Symptoms of Ramsay Hunt Syndrome include: ear pain, hearing loss, tinnitus, difficulty closing one eye, vertigo, dry mouth and eyes, and facial paralysis.

19. Mitev has over 23 years of experience in the sales and sales management industry. Based on his experience and reputation, Defendant recruited Mitev in 2020. Chris Oliver ("Oliver"), Defendant's Regional Vice President ("RVP"), hired Mitev on or about October 9, 2020, as an Account Executive ("AE"). Oliver interviewed Mitev to fill a vacant AE role in the General Business Mid-Enterprise area, which would have placed Mitev in charge of approximately 120 to 150 sales prospects.

20. At the time Defendant hired Mitev, Oliver telephoned Mitev and explained to him that Defendant hired Roy Walker ("Walker"), who previously held the AE role in the Mid-Market area, into the General Business area instead of Mitev. However, Defendant put Mitev into the Mid-Market role that was vacated by Walker. The Mid-Market role is a lower position and provided Mitev with fewer possibilities to work on larger deals for sales prospects compared to the Mid-Enterprise position. Oliver assigned Walker to serve as Mitev's mentor.

21. Mitev typically experiences flare-ups of his Ramsay Hunt Syndrome due to increased stress. When Mitev experiences a flare-up, he has difficulty speaking and hearing which affected his ability to perform the essential functions of his position as an AE.

22. Despite his disability, Mitev met or exceeded Defendant's legitimate employment expectations at all relevant times until Mitev informed Walker of his disability. After informing Walker of his disability, Walker began discriminating against Mitev based on his disability and retaliated against him by putting him on a discriminatory PIP designed to be unachievable.

23. In or about February 2022, Defendant promoted Walker to the role of RVP. Defendant reassigned Mitev and another colleague Redd Reyes ("Reyes") to work under Walker following the promotion. Walker assigned Mitev and Reyes to split the General Business Mid-Enterprise role because they were the most experienced AEs on the team.

24. In or about late June/early July 2022, Defendant began preparations to begin laying off employees. Defendant provided each of its RVPs the discretion to put AEs on a "get-well" plan and eventually a PIP based on their performance evaluations. Defendant offered employees who were placed on a PIP the option to be considered "laid-off" and receive a two-month severance. Defendant referred to this option as a "Prompt Exit Package." At the time, Defendant required its RVPs to sign an agreement stating, "they will treat employees fairly."

25. On or about August 31, 2022, Walker put Mitev on a 30-day "get-well" plan, which became effective on September 1, 2022. Mitev immediately complained to Walker about being on the "get-well" plan because Mitev was the highest performing AE on Walker's team.

26. Mitev experienced increased levels of stress when Walker put him on the "get-well" plan. Due to the stress of being on the "get-well" plan, Mitev began experiencing a flare-up of his Ramsay Hunt Syndrome, which manifested symptoms of paralysis on the right side of his face. Mitev's right eye began constantly tearing and the right side of his mouth began constantly watering. Despite experiencing a flare-up on his Ramsay Hunt Syndrome, Mitev continued to outperform all other AEs on his team.

27. On or about September 28, 2022, Mitev sought medical treatment from his primary care provider. Mitev's primary care provider recommended Mitev consult with a Neurologist, which Mitev did on or about October 13, 2022. Mitev's Neurologist prescribed medication and Botox treatment to help relieve the severity of Mitev's symptoms.

28. On or about October 19, 2022, Mitev informed Walker that he had Ramsay Hunt Syndrome and of the symptoms he was experiencing. Walker responded dismissively.

29. On or about October 31, 2022, 60 days after Walker issued the "get-well" plan, it expired, despite the original "get-well" plan indicating it was only active for 30-days. However, that same day, Walker submitted a performance evaluation to Defendant's Employee Success department. Walker's performance evaluation contained incomplete information and deliberately misrepresented Mitev's performance. Walker deliberately misrepresented Mitev's performance in an attempt to sabotage Mitev's employment.

30. On or about November 6, 2022, Mitev submitted a written response to Defendant's Employee Success department. Mitev provided the information Walker intentionally omitted and evidence providing Walker deliberately misrepresented Mitev's performance.

31. On or about November 11 or 12, 2022, Mitev filed a complaint with Defendant's Human Resources department. Mitev complained about Walker's discriminatory treatment toward him which negatively affected his personal and mental health.

32. On or about November 16, 2022, during their scheduled weekly one-on-one meeting, Walker told Mitev he "should start looking for another job." However, instead of immediately terminating Mitev's employment, Walker provided Mitev with two options: either (1) Mitev could accept Defendant's Prompt Exit Package or (2) Walker would put Mitev on a 30-day PIP. Mitev chose to be put on a PIP and informed Walker he "was not quitting."

33. Walker did not immediately put Mitev on a PIP.

34. On or about November 23, 2022, Michael Hab ("Hab"), Defendant's Human Resources Representative, set-up a virtual meeting with Mitev. During the meeting, Mitev informed Hab about his Ramsay Hunt Syndrome and described the symptoms he had been experiencing since August 2022. Mitev additionally complained about the discriminatory treatment Walker was subjecting him to. Hab emailed Mitev later in the day providing Mitev with information about taking a leave of absence through Defendant's third-party administrator, Matrix. Hab also provided information on how Mitev could seek third-party counseling services from Defendant's Employee Assistance Program.

35. On November 29, 2022, Mitev applied for, and was granted, FMLA leave through Matrix. Matrix immediately provided Defendant with notice of Mitev's leave, which would start December 5, 2022, with an expected return to work date of January 15, 2023.

36. On November 30, 2022, Walker presented Mitev with a PIP. At the time Walker presented Mitev with the PIP, Mitev was either the top performing AE or the second-best performing AE on Walker's team. Walker also put Reyes on a PIP around the same time and no other AEs on Walker's team. However, Reyes was significantly underperforming at the time Walker put him on the PIP. By way of example, by November 30, 2022, Mitev generated approximately $250,000 in revenue for FY23. Reyes generated approximately $5,000 in revenue for FY23.

37. When Walker notified Mitev that he was putting Mitev on the PIP, Walker stated, "I saw you filed for FMLA leave yesterday." Walker issued Mitev the 30-day PIP knowing Mitev would be on FMLA leave during the pendency of the PIP.

38. The November 30, 2022 PIP provides:

> Dimitre, the purpose of this PIP is to communicate my observations of your performance during the get-well plan period from September 1, 2022 to October 31, 2022. This is a follow-up to our conversations over the past month, including November 9, 2022, November 16, 2022, and most recently November 30, 2022.
>
> The intent of this document is to identify the areas requiring improvement, and my expectations moving forward. Unfortunately, I have not seen significant improvement in the areas described in your get-well plan since its conclusion on October 31, 2022. Below are a number of areas that were identified as requiring improvement during the get-well plan period that I consider to require further improvement and therefore justify the implementation of this PIP.
>
> The purpose of this memo is to follow up on our discussions on November 16, 2022 and to document a Performance Improvement Plan (PIP) effective November 30, 2022 for a period of ≥ 30 through December 29, 2022.
>
> Dimitre, the purpose of this PIP is to communicate my concerns regarding your performance. The intent of this documents is to identify the areas requiring improvement, and my expectations moving forward.
>
> Dimitre, Having (sic) and executing on a two-wheel and four-wheel sales cycle plan, engaging our prospective customer executives by leveraging our own leadership, having a compelling business plan and agreed upon mutual close plans to validate timing will help to improve the above-mentioned areas that are not meeting expectations.

39. The PIP provided nine specific categories where Walker expected Mitev to improve, including "Monthly Activity Metrics," "Pipeline Generation and Progression," "Org62 App Rigor," "Executive Engagement," "Face in the Place Meetings (Onsite EKOS, BPRs, Readouts)," "Business Plans: Including Plan to Make Plan, Proposals, Mutual Success Plans, and Close Plans," "Business Plans: Including Proposals and Mutual Close Plans," "New Logo Elibilible (sic) Accounts," and "ACV/Accurate Forecasting and knowing your business."

40. Walker's issuance of the PIP was unwarranted. At the time, Mitev was the highest performing AE on Walker's team.

41. Walker designed the goals and requirements of the PIP to be unachievable. By way of example, under the category: "Monthly Activity Metrics" the stated goal was "210 Calls, 45

8

Connections, 25 Meetings[.]" This required Mitev to call 210 prospective customers, make contact with/speak with 45 of them, and set up 25 meetings with the potential customers. In general, Defendant expects its AE to establish two to three meetings per week. With Mitev's PIP, he would have needed to triple Defendant's expectations. The remaining goals and requirements would have been difficult, if not impossible, to accomplish in a 12-month period, except Walker expected Mitev to accomplish the goals and requirements within 30 days.

42. Despite being on FMLA leave for part of FY23, Mitev finished FY23 at 116% of ACV1 and 104.78% ACV2, generating approximately $700,030.00 in revenue.

43. On or about January 11, 2023, Mitev received further treatment to alleviate his symptoms. Unfortunately, Mitev had an adverse reaction to the treatment and Mitev's primary care provider extended his FMLA leave from January 15, 2023 to February 15, 2024. Matrix granted Mitev's FMLA leave extension and immediately notified Defendant.

44. Mitev returned from FMLA leave on or about February 15, 2023.

45. On or about February 21, 2023, during their scheduled one-on-one, Walker reminded Mitev about the PIP and stated, "this is not going anywhere."

46. The PIP states:

Dimitre, the purpose of this PIP is to communicate my observations of your performance during the get-well plan period from September 1, 2022, to October 31, 2022. This is a follow-up to our conversation, including November 9, 2022, November 16, 2022, and most recently February 22, 2023.

The intent of this document is to identify the areas requiring Improvement (sic), and my expectations moving forward. Unfortunately, I have yet to see significant improvement in the areas described in your get-well plan since its conclusion on October 31, 2022. Below are a number of areas identified as requiring improvement during the get-well plan period that require further improvement and therefore justify the implementation of this PIP.

9

The purpose of this memo is to follow up on our discussion from today February 22, 203 (sic), and to document a Performance Improvement Plan (PIP) effective February 27, 2023, for a total period of ≥ 30 days through March 27, 2023.

*==Dimitre elected to take Medical Leave on 12.5.22 with a return to work date of 1.27.23. On this date, 1.18.23 Dimitre extended his Medical Leave with a new return to work date of 2.15.23. This PIP will restart amongst Dimitre.s (sic) return to work date.==*

(italics and highlighting in original).

47. On or about March 16, 2023, Mitev filed a Charge of Discrimination with the EEOC alleging discrimination based on disability.

48. On or about March 27, 2023, Defendant terminated Mitev's employment.

49. On or about August 23, 2023, Mitev filed a Charge of Discrimination with the EEOC alleging retaliation for engaging in protected activity under the ADA.

## PLAINTIFF'S FIRST CAUSE OF ACTION
### (Violations of ADA—Failure to Accommodate)

50. Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

51. Plaintiff was disabled in that he had physical impairments that substantially limited one or more major life activities, including his ability to control the amount of times he needed to urinate throughout the day, which impacted his ability to work.

52. Defendants had notice of Plaintiff's disability in that Plaintiff told Defendants he had Ramsay Hunt Syndrome.

53. Defendants failed to engage in the interactive process required by the ADA to find a reasonable accommodation that would allow Plaintiff to perform the essential functions of his job and refused to provide Plaintiff with an accommodation.

10

Case 3:24-cv-00497   Document 1   Filed 05/22/24   Page 10 of 13

54. Defendant's violation of the ADA was intentional, willful, and/or undertaken in reckless disregard for Plaintiff's rights.

55. As a proximate and foreseeable result of Defendant's conduct, Plaintiff has suffered lost back and future wages and benefits, expenses, and other damages, which Plaintiff seeks from Defendant.

**PLAINTIFF'S SECOND CAUSE OF ACTION**
**(Violations of ADA—Discrimination)**

56. Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

57. Defendants regularly employed more than fifteen employees at all relevant times.

58. Plaintiff was disabled in that he had physical impairments that substantially limited one or more major life activities, including his ability to control the amount of times he needed to urinate throughout the day, which impacted his ability to work.

59. At all times relevant, Plaintiff was able to perform the essential functions of his job with or without accommodation.

60. Defendants discriminated against Plaintiff by terminating his employment because of his disability.

61. As a proximate and foreseeable result of Defendant's conduct, Plaintiff has suffered lost back and future wages and benefits, expenses, and other damages, which Plaintiff seeks from Defendant.

**PLAINTIFF'S THIRD CAUSE OF ACTION**
**(Violations of FMLA – Retaliation)**

62. Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

63. Defendant unlawfully retaliated against Plaintiff in violation of the FMLA when Walker put Plaintiff on the PIP immediately following his request for FMLA leave.

64. Defendant's actions were intentional, willful, and/or undertaken with reckless disregard to Plaintiff's rights under the FMLA.

65. As a proximate and foreseeable result of Defendant's conduct, Plaintiff has suffered lost back and future wages and benefits, expenses, and other damages, which Plaintiff seeks from Defendant.

### PLAINTIFF'S FOURTH CAUSE OF ACTION
**(Wrongful Discharge in Violation of Public Policy on the Basis of Disability)**

66. Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

67. The public policy of the State of North Carolina as set forth in the NCEEPA, prohibits employers from discriminating against employees because they have a disability. Plaintiff had a physical disability, Ramsay Hunt Syndrome, and is therefore a member of a protected class. This is specifically established in N.C. Gen. Stat. § 143.422.2.

68. Defendants violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 by terminating Plaintiff's employment, a member of a protected class, on the basis of his disability.

69. As a proximate and foreseeable result of Defendants' conduct, Plaintiff has suffered lost back and future wages and benefits, expenses, and other damages, which Plaintiff seeks from Defendants.

70. Defendants' actions were done maliciously, willfully, or wantonly or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a) Order Defendant to pay Plaintiff for all lost wages and employment benefits from the day Defendant discriminated against Plaintiff by terminating his employment until the day of final judgment;

b) Order Defendant to pay Plaintiff compensatory damages;

c) Order Defendant to pay Plaintiff punitive damages;

d) Order Defendant to pay Plaintiff all attorneys' fees, litigation expenses, and cost incurred as a result of bringing this action;

e) Order Defendant to pay Plaintiff pre- and post-judgment interest at the highest rates allowed by law on all sums recoverable; and

f) An Order granting such other and further relief as may be necessary and appropriate.

## JURY TRIAL DEAMAND

Plaintiff demands a trial by jury for all issues of fact.

Dated: May 22, 2024.

        Respectfully submitted,

        s/ Corey M. Stanton
        Philip J. Gibbons, Jr., NCSB #50276
        Corey M. Stanton, NCSB #56255
        **GIBBONS LAW GROUP, PLLC**
        14045 Ballantyne Corporate Place, Suite 325
        Charlotte, North Carolina 28277
        Telephone: (704) 612-0038
        Facsimile: (704) 612-0038
        Email: phil@gibbonslg.com
               corey@gibbonslg.com

        *Attorneys for Plaintiff*